**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

UBS FINANCIAL SERVICES INC., a
Delaware corporation,

        Plaintiff,

v.

TRAVIS LUEBBEHUSEN, an individual and
MELANIE AVERY, an individual,

        Defendants.

**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF**

Plaintiff, UBS Financial Services Inc. ("UBS" or "Plaintiff"), files this Verified Complaint For Injunctive Relief against Defendants Travis Luebbehusen ("Luebbehusen") and Melanie Avery ("Avery") (collectively "Defendants") and alleges as follows:

**I.      PRELIMINARY STATEMENT**

1.      This dispute arises out of Luebbehusen's and Avery's abrupt, coordinated resignation from their employment with UBS on March 10, 2022, and their immediate commencement of employment with Wells Fargo Clearing Services, LLC d/b/a Wells Fargo Advisors ("Wells Fargo"), a direct competitor of UBS.

2.      In breach of their contractual and legal duties, Luebbehusen and Avery began soliciting their former UBS clients within hours of resigning from UBS, including via an email blast sent on their behalf by Wells Fargo to, upon information and belief, many or most of their former UBS clients.

3.      The email contained a link to a professionally produced video in which Defendants, standing in their new Wells Fargo office with their sales assistant (also from UBS), tout Wells

-1-

Fargo's capabilities and state that they will be contacting "each one of you as soon as we can" in the coming days.



4.      Defendant Luebbehusen also states in the video that "**We are excited to show you the additional capabilities, product offerings and resources that are available to you as we transition our practice to Wells Fargo Advisors."** Defendant Avery similarly promotes the purported advantages of Wells Fargo, stating: **"One of the reasons we made this move was due to the direct access we would have to the firm's leadership and resources. This home field advantage provides significant benefits for our clients, as we are only a short drive away from the firm's headquarters in downtown St. Louis."**

5.      And the video makes clear that the Defendants were laser-focused on transferring clients' assets to Wells Fargo as soon as possible. The sales assistant hypes the team's ability to "ensure that the transfer of assets is a smooth and effortless process" and assures clients that they are "committed to making this move as seamless as possible for you."

6.      The fact that this video was emailed to UBS clients the same day that Defendants resigned from UBS strongly suggests that Defendants misappropriated the confidential, private email addresses of UBS clients and provided them to Wells Fargo.

7.      As stated in the video, Luebbehusen and Avery followed up on the email blast by calling clients to invite or encourage them to transfer their accounts from UBS to Wells Fargo. Upon information and belief, Luebbehusen and Avery used confidential UBS client information (*i.e.*, client phone numbers) to make the phone calls to clients.

8.      Luebbehusen's and Avery's solicitation of UBS clients has already caused UBS substantial damage – as trumpeted publicly by Randall Cathcart ("Cathcart"), a former UBS colleague with whom they have teamed up at Wells Fargo. According to a March 14, 2022, interview with industry publication AdvisorHub, Cathcart stated: "'We're finding that clients were very receptive . . . We can't move accounts over fast enough.'" Cathcart further states in the article that **"'the team has already moved 400 accounts'"** to Wells Fargo. *See* Ex. A (AdvisorHub Article) (emphasis added). According to the article, Cathcart's comments were made a mere <u>two business days</u> after Luebbehusen and Avery resigned.

9.      Before their resignations, Luebbehusen and Avery were a very successful financial advisor team in UBS's Chesterfield, Missouri branch office.  Together they managed UBS clients with assets of nearly $450 million that generated more than $4 million in annual revenue for UBS.

10.      Luebbehusen's and Avery's success was due, in significant part, to the fact that they received a substantial book of business from a senior UBS financial advisor under UBS's Aspiring Legacy Financial Advisor ("ALFA") program.  As a condition of receiving those UBS clients, Luebbehusen and Avery each executed a specialized ALFA Receiving Financial Advisor Agreement (a "Receiving Agreement"), setting forth the terms under which they would receive

and service specified UBS clients following the voluntary separation from employment of the senior financial advisor.

11.     Importantly, their Receiving Agreements each contained confidentiality and non-solicitation provisions prohibiting Luebbehusen and Avery from misappropriating UBS client information and from soliciting, for a period of one year after termination of employment, those UBS clients they were assigned to service pursuant to the ALFA program.  The Receiving Agreements specified that, **"any contact or communication, of any kind whatsoever" initiated by Luebbehusen and Avery, for the purpose of inducing a covered client to transfer an account, would constitute prohibited solicitation**.

12.     In addition, Luebbehusen and Avery signed other agreements with UBS barring them from disclosing or misusing UBS client information. Avery also signed a training agreement when she joined UBS barring her from soliciting, for a period of six months from the termination of her employment, any UBS client she serviced.

13.     Luebbehusen's and Avery's solicitation of clients and misuse of UBS client information is in direct breach of their Receiving Agreements and the other agreements they signed with UBS.

14.     As of the date of this court filing, UBS has received requests for the transfer of over $170 million in client assets from UBS to Wells Fargo, including over $132 million from clients covered by the ALFA program and Luebbehusen's and Avery's Receiving Agreements.

15.     Upon information and belief, Luebbehusen and Avery's breach of their contractual obligations has been aided and abetted by Wells Fargo employees, including Cathcart.  Like Luebbehusen and Avery, Cathcart is former UBS financial advisor who is now employed with Wells Fargo.

16.     Upon information and belief, Wells Fargo supplied Luebbehusen and Avery with a highly lucrative transition package, likely worth more than $12 million between the two of them, as an inducement to join Wells Fargo.

17.     UBS now brings this action against its former employees Luebbehusen and Avery to protect its client relationships, confidential information, and prevent further irreparable harm to its business from Luebbehusen's and Avery's breach of their agreements with UBS and UBS's policies. Absent the requested injunctive relief, UBS client assets will continue to flow out of UBS to Wells Fargo.

18.     The merits of this dispute are subject to mandatory arbitration before the Financial Industry Regulatory Authority ("FINRA").  However, under Rule 13804 of the FINRA Code of Arbitration Procedures ("FINRA Code"), UBS is exercising its right to seek temporary injunctive relief in this Court.  In compliance with the FINRA Code, UBS is filing a Statement of Claim with FINRA against Defendant contemporaneously with this Petition.

## II.     PARTIES

19.     Plaintiff UBS Financial Services Inc. is a Delaware corporation with its principal place of business in the State of New York.  UBS does business in Missouri, including in St. Louis County, Missouri.

20.     Defendant Travis Luebbehusen is an individual who worked for UBS in St. Louis County, Missouri.  He may be served at his last known address of 4717 Crosshaven Drive, Weldon Springs, Missouri 63304.  Luebbehusen worked for UBS from January 2009 until his voluntary resignation on March 10, 2022. Upon information and belief, he currently works for Wells Fargo in St. Louis County, Missouri.

21.     Defendant Melanie Avery is an individual who worked for UBS in St. Louis County, Missouri.  She may be served at her last known address of 2381 Maybrook Lane,

Kirkwood, Missouri 63122. Avery worked for UBS in the wealth management group of its Chesterfield, Missouri office from January 2009 until her voluntary resignation on March 10, 2022. Upon information and belief, she currently works for Wells Fargo in St. Louis County, Missouri.

### III.    JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because all Plaintiffs and all Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

23.    This Court has general personal jurisdiction over Defendants, because the Defendants are residents of St. Louis County, Missouri.

24.    Venue is proper because the actions at issue in this case took place in St. Louis County, Missouri, located in the Eastern District of Missouri.

### IV.    FACTS

**About UBS**

25.    UBS is a securities broker-dealer with operations throughout the United States. UBS is a FINRA member firm.

26.    In addition to other services, UBS provides wealth management services to clients throughout the United States, including in St. Louis County, Missouri.  To provide these services, UBS employs Financial Advisors ("FAs") to manage the wealth of its individual and institutional clients.

27.    UBS has various locations in St. Louis County, Missouri, including a branch office in Chesterfield, Missouri.

28.    UBS spends considerable resources building goodwill with customers and potential customers. The firm invests significant time in developing confidential and proprietary

information regarding its products, services, customers, and potential customers ("Confidential Information"). UBS also expends considerable resources to maintain the confidentiality of its Confidential Information, including without limitation, the following: password protecting all computers, limiting remote access to its electronic data, limiting storage methods of its electronic data, and monitoring transmission of its electronic data outside of its network. This Confidential Information is not generally known in the industry and provides UBS with a competitive advantage in the financial services and wealth management markets.

29.     UBS also takes steps to maintain the confidentiality of its Confidential Information and the resulting competitive advantage it derives from that information by preventing the dissemination of its Confidential Information outside of the organization. For example, employees who are given access to the company's Confidential Information are required to execute and comply with confidentiality agreements. Luebbehusen and Avery entered into several such agreements with UBS during their employment as described below.

30.     Additionally, UBS requires all employees, including Luebbehusen and Avery, to abide by and annually confirm their adherence to certain policies regarding the protection of its Confidential Information, including without limitation its Code of Conduct, Group Data Protection Policy, and its Bring Your Own Device Policy (collectively, the "Confidentiality Policies").

**Luebbehusen and Avery Received Clients Under the ALFA Program**

31.     Luebbehusen and Avery were a highly successful financial advisor team in UBS's Chesterfield, Missouri branch office. Together they managed UBS clients with assets of nearly $450 million that generated more than $4 million in annual revenue for UBS.

32.     A significant number of the UBS clients serviced by Luebbehusen and Avery were clients transitioned to them from former UBS financial advisor Susan Brandt, who separated from active employment with UBS in 2019.

33.     Brandt, Luebbehusen, and Avery had worked together for a number of years at UBS as a financial advisor team.

34.     In December 2016, in connection with her plan to leave her employment with UBS at a future date, Brandt entered UBS's ALFA program under which the clients she served, including as part of a team with Luebbehusen and Avery, would be transitioned to Luebbehusen and Avery.

35.     Under the ALFA program, Brandt was obligated to remain employed by UBS for a period of two years, during which she agreed to work to introduce clients to Luebbehusen and Avery and/or take all necessary steps to solidify the clients' relationships with Luebbehusen and Avery.  At the end of the two-year period, Brandt would separate from active employment with UBS, but would continue to receive payments from UBS for an additional three years based on revenues generated on the clients covered by the ALFA arrangement and serviced by Luebbehusen and Avery.

36.     As an express condition of receiving the UBS clients formerly serviced by Ms. Brandt pursuant to the ALFA program, Luebbehusen and Avery were each required to sign a Receiving Agreement that contained non-solicitation and confidentiality covenants.

37.     Luebbehusen signed a Receiving Agreement on December 12, 2016. *See* Ex. B (the "Luebbehusen Receiving Agreement").

38.     Avery signed a Receiving Agreement on January 17, 2017. *See* Ex. C (the "Avery Receiving Agreement").

39.     In exchange for receiving the UBS clients formerly serviced by Ms. Brandt pursuant to the ALFA arrangement, Luebbehusen and Avery both agreed in their Receiving Agreements to keep all information relating to those accounts (the "Received Accounts") confidential, including, but not limited to, client names, addresses and telephone numbers

("Confidential Information"), not to disclose the Confidential Information for the benefit of any third party, and to stop using and/or return the Confidential Information upon leaving UBS's employ.  *See* Ex. B ¶ 5 and Ex. C. ¶ 5.

40.    Luebbehusen and Avery also agreed that if his or her employment with UBS ended for any reason, he or she would not, "solicit, directly or indirectly, any [c]lient with any of the Received Accounts for (i) one year following [his or her] termination or suspension or (ii) until the last Year date set forth in the Schedule in Section 4(c) above, whichever is greater."  *See* Ex. B ¶ 6(a); Ex. C ¶ 6(a).[1]  The term "solicit" was defined to mean that he or she would not "directly or indirectly ***initiate any contact or communication, of any kind whatsoever***" with any customer on a Received Account to induce him or her to transfer any Received Account, open a new account with a competing company, or cease doing business with UBS.  *See id*.  (emphasis added).

41.    Luebbehusen and Avery also agreed that if they breached their covenant to maintain the confidentiality of UBS's Confidential Information or if they breached their post-termination covenant not to solicit UBS's clients, UBS "will suffer immediate and irreparable harm and that money damages will not be adequate to compensate [UBS] or to protect or preserve the status quo."  *See* Ex. B ¶ 7(a); Ex. C ¶ 7(a).  Therefore, they each "expressly consent[ed] to the issuance of a temporaryy restraining order and/or a preliminary injunction . . . to prohibit the breach of [the] Agreement, to preclude the improper disclosure or use of Confidential Information[,] and to enjoin [them], [their] new employer[,] and/or any entity or individual with whom [they] become affiliated, from Soliciting (as defined in Section 6) any of the Received Accounts or Clients with any of the Received Accounts."  *Id*.

**Luebbehusen's and Avery's Other Agreements With UBS**

---

[1] The last year date set forth in Section 4(c) is 2021.  *See* Ex. B ¶ 4(c); Ex. C ¶ 4(c).  Therefore, the applicable non-solicitation period is one year following Luebbehusen's and Avery's termination or suspension.

42.     On February 20, 2019, Luebbehusen entered into a Deferred Cash Award Agreement with UBS.  *See* Ex. D.  In exchange for the right to receive certain cash payments, Luebbehusen agreed, among other things, that he would not "directly or indirectly use, maintain, take or disclose any Confidential Information," including, but not limited to, "client lists and contact information," except while performing his duties for UBS, as required by law or a governmental agency, or as otherwise provided for in the Deferred Cash Award Agreement.  *Id*. ¶ 6.

43.     Luebbehusen further agreed that upon the termination of his UBS employment, his "use of Confidential Information, including, but not limited to, any information referring or relating to clients of [UBS], former clients of [UBS], and prospective clients of [UBS], must immediately cease and that Employee must immediately return, destroy or delete, any Confidential Information whether in hard copy or computerized form, *including in any electronic device owned by Employee*." *Id.* (emphasis added).

44.     On January 9, 2009, Avery entered into an Agreement for New Financial Advisors in the Development Program (the "Development Program Agreement").  *See* Ex. E (the "Development Program Agreement").

45.     By executing the Development Program Agreement, Avery agreed not to "solicit, directly or indirectly, for a period of six months from the date of termination of Employee's employment, any of the clients who maintain Accounts at [UBS] whom Employee serviced during his or her employment . . . or other Clients . . . whose names became known to Employee while in the employ of [UBS]."  *See* Ex. E, ¶ 2.1(a).  The term "solicit" was explained to mean that she would "not initiate, whether directly or indirectly, any contact or communication, *of any kind whatsoever*, for the purpose of inviting, encouraging, or requesting a client, or that may have the

effect of inviting, encouraging or requesting a client" to transfer or discontinue the client's UBS relationship or to open a new account with her new employer.  *See* Ex. E, ¶ 2.2 (emphasis added).

46.     Avery acknowledged that during her UBS employment she would have access to valuable information acquired by UBS through its expenditure of time, effort, and money or through her efforts during her employment, that such information is generally not known to others, and "includes, without limitation, the names, addresses and telephone numbers of [UBS] clients; the assets and obligations carried in the accounts of [UBS] clients (commonly called 'positions'); holding books or client book pages; client monthly statements; client account histories; client lists; prospect lists; client risk profiles; financial and personal information regarding clients and prospects; computer software or hardware for use in computer or word processing equipment; and documents or computer programs prepared or generated by [Avery] using [UBS] property and/or records . . ." defined as "Restricted Information."  *Id*. ¶ 1.1.  Avery agreed that Restricted Information is unique to UBS, would be difficult and would require the expenditure of substantial time and effort to duplicate or replicate by proper means, that UBS views Restricted Information as highly confidential, and that UBS takes all reasonable measures to maintain the confidentiality of its Restricted Information.  *Id*.

47.     Avery also acknowledged and agreed that she would have access to "records and documents concerning the business and affairs of [UBS] (hereinafter referred to as 'Company Records')."  *Id*. ¶ 1.2.

48.     Avery specifically agreed, "that, during the course of [her] employment with [UBS] [she] will not remove Restricted Information or Company Records from [UBS's] premises . . . except in the ordinary course of conducting business for . . . [UBS] and will not use Restricted Information or Company Records for any purpose other than the purpose of conducting the business of [UBS]."  *Id*. ¶ 1.3.

49.     Avery specifically agreed that upon the voluntary termination of her employment, her use of Restricted Information and Company Records would stop; that she would immediately deliver to UBS any originals or copies of Restricted Information or Company Records without retaining any copies, and that she would permit UBS to "inspect, prior to removal, any materials or laptop computer to be taken from UBS's offices and her work area including her desk and cabinets. *Id*. ¶ 1.4.

50.     Avery specifically agreed, "that [her] use of Restricted Information and Company Records will stop immediately upon [her] determination to leave [UBS] employment. *Id*. ¶ 1.5.

51.     Avery specifically agreed "that both during and subsequent to the course of [her] employment with [UBS], [she] will not disclose to any third person or entity the content, in whole or in part, of Restricted Information or Company Records, except in the ordinary course of conducting business for [UBS] . . . ." *Id*. ¶ 1.6.

52.     In the event of a breach of her duty not to solicit UBS's customers after the termination or her employment—or in the event of a breach of her duty to maintain the confidentiality and not to use UBS's Restricted Information and Company Records except to conduct UBS business—Avery agreed that UBS "will suffer immediate and irreparable harm," and that money damages will not be adequate to compensate or to protect and preserve the status quo. *Id*. ¶ 3.1.  Therefore, in such circumstances, Avery "expressly consent[ed] to the issuance of a temporary restraining order or a preliminary injunction, without bond, by any court with jurisdiction over [her] to prohibit the breach of any provision of [the] Agreement . . . ." *Id*.

53.     In addition to the foregoing agreements, during their employment, Luebbehusen and Avery both agreed to abide by all of UBS's policies, including its Confidentiality Policies.

**Luebbehusen's and Avery's Resignations and Violations of UBS Agreements and Policies**

54.     Luebbehusen and Avery each resigned from their positions at UBS on the same date—Thursday, March 10, 2022.

55.     Despite the foregoing restrictions contained in their Receiving Agreements and in the other agreements and policies described above, Luebbehusen and Avery immediately began reaching out to their respective UBS customers—including Received Accounts handed to them under their Receiving Agreements—to solicit them to move their accounts to Wells Fargo.

56.     In the evening of March 10, 2022, Wells Fargo sent an email on behalf of Luebbehusen and Avery to two individuals (a husband and wife) who were UBS clients they serviced at UBS. The clients were Received Accounts whom Luebbehusen and Avery had expressly agreed not to solicit in their Receiving Agreements. The email states: "I wanted to share a short video with you about the move from UBS to Wells Fargo Advisors. We will reach out to you tomorrow to assist with the download of your UBS statements." *See* Ex. F. The email includes Luebbehusen's and Avery's new Wells Fargo direct dial phone numbers.

57.     The email also contains a link to a video found on the webpage of Luebbehusen's and Avery's new team at Wells Fargo. The professionally produced video is just over 3½ minutes in length and shows Luebbehusen and Avery standing in their new Wells Fargo office, accompanied by Amy Clark ("Clark"), the former UBS sales assistant who resigned with Luebbehusen and Avery to join Wells Fargo. (A transcript from the Wells Fargo webpage of the video is attached as Ex. G hereto. A copy of the complete video will be filed separately.)

58.     The video opens with Luebbehusen stating "Hello, everyone. I am here with our team to share some very exciting news." Luebbehusen then says that they will be contacting "each one of you" in the coming days:



59.     The remainder of the video consists of Luebbehusen, Avery, and Clark taking turns speaking.

60.     Luebbehusen describes the "additional capabilities, product offerings, and resources" they will allegedly be able to offer clients at Wells Fargo:





61.     Avery then talks about the purported "homefield advantage" that Wells Fargo offers, saying "One of the reasons we made this move was due to the direct access we would have to the firm's leadership and resources." She then states:



62.     Next, Clark talks about their team is "committed to making this move as seamless as possible for you" and ensuring "that the transfer of assets is a smooth and effortless process" for clients.



63.     The video closes with Luebbehusen stating on behalf of the team that they look forward to continuing to serve their clients at Wells Fargo:



We look forward to continuing to serve you / as we transition our practice to Wells Fargo Advisors.

64.     Upon information and belief, the email containing the link to the video was part of an email blast sent to many or most of the UBS clients that Luebbehusen and Avery serviced during their UBS employment, including to Received Accounts.

65.     The fact that this video was emailed to UBS clients on the very same day that Luebbehusen and Avery resigned from UBS strongly suggests that they misappropriated the confidential private email addresses of UBS clients and provided that information to Wells Fargo.

66.     Luebbehusen and Avery made good on the promise made in the video to contact the clients. Numerous UBS clients (including clients with Received Accounts) have reported to UBS that Luebbehusen and Avery contacted them about their move to Wells Fargo. UBS clients have also reported to UBS that Luebbehusen and Avery offered to lower their management fees as an incentive for UBS clients to move their accounts to Wells Fargo.

67.     Beginning the very next business day after their resignations, on March 11, 2022, Luebbehusen and Avery began calling UBS—with UBS clients on the line—to request that UBS take steps necessary to prepare the clients' accounts (including Received Accounts) for transfer to Wells Fargo.

68.     On Friday, March 12, 2022, Peter Sanfelippo, Luebbehusen and Avery's former supervisor at UBS, spoke with a substantial UBS client[2] whose assets had been managed by

---

[2] UBS will identify the client to the Court, in camera, if necessary.

Luebbehusen and Avery after having received the client through UBS's ALFA program.   This

client assured Sanfelippo that he would not be making any decisions about moving his assets away

from UBS until after tax season in mid-April.

69.     Nevertheless, on Sunday, March 13, 2022, the same client emailed Sanfelippo to

inform him that he had decided "to transition all of [his] accounts to Wells Fargo."   *See* Ex. H.

The client stated that he "had a long call with [Luebbehusen] that morning to discuss and [they]

will work to transition [the] accounts."   *Id*. The client's change of heart clearly reflects solicitation

by Luebbehusen in breach of his obligations to UBS.

70.     By Monday, March 14, 2022, their former UBS colleague and new Wells Fargo

teammate Cathcart was touting the success they were having in moving accounts. According to an

article posted to the AdvisorHub website on March 15, 2022, quoting an interview with Cathcart

from the prior day, ''the team has already moved 400 accounts . . . .'" *See* Ex. A. The article also

quotes Cathcart as saying "'We're finding that clients were very receptive. . . . We can't move

accounts over fast enough.'" *Id.*

71.     In addition, on Monday March 14, 2022, Cathcart sent a text message to Mr.

Sanfelippo, indicating that "[s]everal clients are lined up today" who "need to call the branch to

break fixed credit lines."   *See* Ex. I.   Cathcart asked, "for some guidance."   *Id*.   Avery responded,

stating, "Yes, thank you for your help in advance."   *Id*.

72.     Upon information and belief, Luebbehusen and Avery plainly used UBS's

Confidential Information to initiate these communications, including customer contact information

for Received Accounts.    Luebbehusen and Avery agreed that any UBS information, including

client contact information, belonged to UBS, could only be used in the course of UBS business,

and could not be accessed or used following their separation from employment.    Given the

extremely short interval between their resignations on March 10, 2022, and Wells Fargo sending

out the evening email blast on March 10, 2022, and UBS receiving multiple client requests to transfer their accounts to Wells Fargo, beginning as early as March 13, 2022, there can be little doubt that Luebbehusen and Avery used protected UBS client contact information on their cell phones to initiate contact with UBS clients.

73.     Defendants' wrongful actions to date have had the desired effect. As of Monday, March 14, 2022, just four days after Luebbehusen and Avery resigned from UBS, no less than four UBS clients with assets totaling approximately $17.7 million had requested that UBS transfer their accounts to Wells Fargo.

74.     As of the date of this court filing, UBS has received requests for the transfer of over $170 million from UBS to Wells Fargo, including over $132 million in Received Accounts.

75.     Defendants' continued solicitation of the UBS clients and, upon information and belief, use of UBS client information is causing UBS irreparable harm, and will continue to do so unless they are enjoined.

## V.     CAUSES OF ACTION

### Count I: Breach of Contract

76.     The facts set forth above are incorporated by reference as if fully set forth herein.

77.     During their employment, Luebbehusen and Avery entered into their respective Receiving Agreements as set forth above prohibiting them from soliciting clients and possessing, disclosing, or using UBS's confidential information.  *See* Exs. B, C.  The Receiving Agreements were supported by consideration, which Luebbehusen and Avery acknowledged and received.  The post-employment restrictions contained within the Receiving Agreements are reasonable and necessary to protect UBS's business interests and are reasonable and narrowly tailored to do so.

78.     UBS fulfilled its obligations to Luebbehusen and Avery under their respective Receiving Agreements.

79.     By and through their actions as set forth above, soliciting UBS clients and using and/or disclosing UBS's Confidential Information, Luebbehusen and Avery have breached their contractual obligations to UBS set forth in their respective Receiving Agreements.

80.     As a direct and proximate result of Luebbehusen's and Avery's breaches of their respective Receiving Agreements, UBS has suffered and will continue to suffer substantial harm and damages.  Luebbehusen and Avery have wrongfully diverted millions of dollars of UBS client assets away from UBS to Wells Fargo for their own enrichment.

81.     Luebbehusen's and Avery's breaches of their respective Receiving Agreements are ongoing.  They have caused, and will continue to cause, UBS to suffer irreparable harm for which UBS has no adequate remedy at law.

### Count II: Injunctive Relief

82.     The facts set forth above are incorporated by reference as if fully set forth herein.

83.     UBS requests that the Court enter a temporary restraining order and preliminary injunction to enjoin Luebbehusen and Avery's further breaches of their respective Receiving Agreement as described herein (tolling the post-employment restrictions during the time of their breaches).

84.     UBS has suffered irreparable injury.  Unless enjoined from the conduct described above and from further breach of their respective Receiving Agreements—UBS will continue to be irreparably harmed by the loss of goodwill, loss of reputation, and loss of customers and business—losses that cannot be easily quantified.

85.     Given the allegations set forth above, unless Luebbehusen and Avery are enjoined, it is highly likely that UBS  will continue to suffer irreparable injury in the future for which there is no adequate remedy at law.  An award of money damages are an inadequate remedy to redress such continuing injury to UBS's goodwill, reputation, competitive advantage, and market share—

injuries that cannot be easily quantified.  Importantly, Luebbehusen and Avery agreed in their respective Receiving Agreements that UBS would be entitled to seek an injunction for any breach or threatened breach of their Receiving Agreements, and they each *consented* therein to such injunctive relief.  *See* Ex. B at ¶ 3.1, Ex. C at ¶ 3.1.

## VI.   ATTORNEYS' FEES

86.   UBS is entitled to recover its reasonable attorneys' fees under the Receiving Agreements.  *See* Ex. B at ¶ 12(f) ; Ex. C at ¶ 12(f).

## VII.   PRAYER FOR RELIEF

87.   Based on the foregoing, UBS respectfully demands judgment for temporary injunctive relief pending FINRA arbitration, that:

A.   Enjoins Luebbehusen and Avery, and all other persons who are in active concert or participation with them, including, but not limited to Randall Cathcart, from soliciting business from UBS clients in violation of their respective Receiving Agreements;

B.   Enjoins Luebbehusen and Avery, and all other persons who are in active concert or participation with them, including, but not limited to, Randall Cathcart, from using UBS's confidential information in violating of their respective Receiving Agreements with UBS and UBS's policies;

C.   Enjoins Luebbehusen and Avery, and all other persons who are in active concert or participation with them, including, but not limited to, Randall Cathcart, from otherwise violating their respective Receiving Agreements with UBS;

D.   Requires Luebbehusen and Avery, and all other persons who are in active concert or participation with them, including, but not limited to, Randall Cathcart, to immediately return to counsel for UBS all originals, copies or other reproductions, in any form whatsoever, any UBS confidential information or other property in their possession, control, or custody;

      E.      Awards UBS its attorneys' fees and costs; and

      F.      Grants UBS such additional relief to which it may be entitled and that is just

and proper.

Dated:  March 23, 2022             Respectfully submitted,

                        /s/ Christopher A. Pickett
                        Christopher A. Pickett  #51059(MO)
                        Attorney for Plaintiff
                        Greensfelder, Hemker & Gale, P.C.
                        10 South Broadway Street
                        Suite 2000
                        St. Louis, MO 63102
                        (314) 516-2654
                        Fax: (314) 241-8624
                        Email: cap@greensfelder.com

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that I am a Vice President of UBS Financial Services, Inc., that I have reviewed the foregoing Verified Complaint, and that the foregoing allegations are true and correct.

Executed on: March 23, 2022

Peter M. Sanfelippo II

4858-3791-8476, v. 3